Good morning, counsel. Good morning, your Honor. All right, Mr. Gershengorn, when you're ready. Good morning, your Honors, and may it please the Court. Defendants operate wildly popular websites that engage in and facilitate massive infringement of plaintiffs' U.S. copyrights in the United States. The United States is defendants' third biggest market, and each year defendants make handsome profits by sending hundreds of millions of infringing music files to their U.S. users. If defendants were responding to their user requests by sending into their third biggest market hundreds of millions of vinyl records or music CDs, no one could dispute there would be personal jurisdiction in the United States. The result is no different because defendants have chosen to send that music by means of electronic files rather than by using vinyl records or physical CDs. The practical consequences of the decision below are devastating. The District Court has provided a roadmap for pirate websites to operate with impunity while they enable and profit from massive infringement of plaintiffs' U.S. copyrights in the United States. That result is implausible as a matter of due process law, and it is especially so given that Congress passed Rule 4K2 precisely to prevent such results. The District Court was simply wrong to hold that defendants could not reasonably expect to be held into the court in the United States, not in a single court in the United States, by U.S. copyright holders to answer for their U.S. infringement. Yes, Your Honor. After you filed, both of you filed your briefs, a case named Frederick versus Marriott International was filed in this circuit. Does that case have any bearing on your case? Your Honor, I think that case reinforces why we prevail here, and I'll explain why. What Marriott, that case is in, the contacts at issue in Marriott or Fidrich are in a different league in the cases here, and they illustrate exactly how the Zippo test works in practice. In Fidrich, remember, there were nothing at all of consequence happened in South Carolina. Even the reservation wasn't made there. All of the harms happened in Italy, and so what this court said was the Marriott website was essentially a 1-800 number, a communications pathway that allowed the two parties to talk. This case is the polar opposite. It is a knowing and repeated transmission of files. That puts it in the interactive category of Zippo, not the semi-interactive, and indeed the critical point here is the downloads themselves are the unlawful activity. It is the very files that are being transmitted to the United States that are the infringement. Unlike a pathway to communications like was at issue in Fidrich, this is an open floodgate to the transmission of infringing files. Indeed, if I could step back and talk for a sec about the overall package of things that make this what I think is a straightforward case under due process analysis, and there are five things that I'd like to point to. The first is the volume and share of the file transmissions. We are talking about hundreds of millions of files into the defendant's third biggest market. There is no case that holds that the defendant's third biggest market is not one where it's subject to personal jurisdiction. The hard cases from this court and from the Supreme Court are ones where the defendant isn't operating, where their product has been brought in inadvertently. They're not ones which their third biggest market. Second, as I've already touched on, this is highly interactive. It is the classic case of knowing and repeated transmissions of files that is interactive under ZIPA. Third, the plaintiffs are, the defendants make their money from advertisements that are targeted to the jurisdiction. They are not indifferent to the fact that the files are going to the United States. Indeed, they tell their users, we are collecting your information precisely so we can use it for targeted advertising, and that is what they do. They make more money from their users in the United States because they target their users in the United States. Fourth, they have failed to take any measures at all to block, stop, discourage, or otherwise dissuade US users from using their, to use their service. The failure to block, as the defendant's targeting of the jurisdiction. And finally, in sort of a classic case of invoking the protection of the forum's laws, they have a registered DMCA agent. The only point, and I guess the principal point of that DMCA agent is to invoke the protections of the DMCA, the Digital Millennium Copyright Act, and so they have literally invoked the protections of US law. The district court concluded otherwise, and with respect to the court, I believe he just erred. So the first thing, and I think that for three reasons. First, the district court concluded that this was semi-interactive. I want to make clear, we prevail even if this were semi-interactive because of the nature and the extent of the context that I've outlined, but this is not semi-interactive. This is, as Zippo said, the knowing and repeated transmission of computer files. The Marriott case that Your Honor mentioned earlier, that Judge Floyd mentioned earlier, talked about a middle ground where a user can exchange information with the host computer. That is not this. This is the knowing and repeating transmission of computer files. The district court concluded otherwise because he thought the relationship between the user and the site was insufficiently, of insufficient duration. But just because defendants have optimized their system so that the infringing files come fast and furious can't mean that there isn't knowing and repeated transmission of files. Second, the district court thought that this was unilateral actions of the user. This is not unilateral action in the relevant sense. Unilateral action is when your product goes someplace you don't expect because of the user's action. So if, for example, a user in Brazil downloaded a file and then took his computer to Virginia, that would be unilateral action. Or if a user in Italy downloaded a music file and emailed it to his friend in Virginia, that would be unilateral action. It is not unilateral action for the users to operate the system just as it was intended. And I think the GoDaddy case from the Seventh Circuit makes this point clearly. What GoDaddy said in response to this same argument, that residents, what the Seventh Circuit said is, quote, GoDaddy itself set up the system this way. It cannot now point to its hundreds of thousands of customers in Illinois and tell us it was all their idea. That's exactly what happened here. And then the third thing that the district court said was that this was not a commercial arrangement. Quite honestly, that just misunderstands commercial arrangements on the Internet. Under that reasoning, that because the users didn't pay money to the defendants, massive profitable companies like Google and Facebook wouldn't be commercial enterprises, that seems crazy to me. What is going on is that in the Internet age, the actual commercial transaction is the sending of files in this in return for receiving ads. The companies collect your ad information to send targeted ads and that's how they make their money. And of course, that's exactly what's happening here. It's a classic commercial arrangement. The other thing the district court didn't consider at all, I think, is the consequences. And I think they're serious here. Remember, what this has done is allow a pirate website to set up shop and know that as long as it automates its arrangements so that the actual button that's clicked is by a user in the United States, and as long as it otherwise operates offshore, and then as long as it gives its advertisements to a third-party advertiser, it is completely immune from copyright infringement actions by U.S. users, by U.S. copyright holders, excuse me, for their U.S. users for copyright infringement in the United States. That can't be the law. And as I say, that's particularly true in the United States. The whole point of 4K2 was to avoid a situation just like this one, where an entity like defendants is operating across the country and then says, oh, but you can't get me in any particular state. So what 4K2 does, of course, is then say, when your contacts with the United States as a whole are massive and systemic as they are here, then, of course, you can be hailed into court. The other side's argument is essentially that because we operate everywhere, we can't be sued anywhere, cannot be right. And I think that the case that illustrates that most clearly is the Keaton case from the Supreme Court. Remember, in the Keaton case, there was no advertising mentioned at all. The market share in New Hampshire was less than 1%. And yet, what the Supreme Court held was there the sending in of 15,000 copies there of Hustler Magazine subjected the defendant, excuse me, Hustler, to personal jurisdiction in New Hampshire. This case, again, is far easier than that because the jurisdiction is to the third biggest market and is nationwide. Again, the other point I'd like to just touch on briefly, in addition to the sort of unilateral action that I touched on earlier, is the lack of filtering. Other cases where the courts have found a lack of personal jurisdiction, like the Toys R Us case or the YouCoup case, are ones in which, for example, the websites were in a foreign language. Sure, in that situation, there may well be no target, but there may well be no filtering because they've tried not to discourage their U.S. users from using it. Here, of course, there is no filtering, and that's in a situation in which filtering in the industry is common. If I am watching, for example, a University of Virginia sportscast on my iPad, and then I travel to California, that may well be blocked in California, and we've all experienced that. That's because legitimate sites, including Spotify and Apple Music and others, will block based on where they don't have licenses. Of course, that's not what's happening here. Indeed, the cases recognize that. The Plexer case, for example, in the First Circuit, recognizes that the failure to block or filter or even put up a disclaimer. Now, we don't think a disclaimer would be sufficient here, but even put up a disclaimer saying, we don't want U.S. users has to be required. It can't be that you can have hundreds of millions of users, that you can send those users hundreds of millions of copies, and then you can say, well, it's unfortunate that I'm being held into court in the United States, but I had no idea when you take no steps at all to block it. Then, I think a useful analogy, Your Honor, comes from the Supreme Court's Grokster case. Now, Grokster, of course, is not personal jurisdiction, and it's not looking at purposeful availment or anything like that, but what Grokster pointed to was two important things that are present here to show purpose. One is the absence of filtering, and what the Grokster court said was, you could filter out all these infringing files and prevent this infringing conduct, and you don't. Surely, that's relevant to your intent. Then, the second point is that the Supreme Court recognized in Grokster that the essence of the commercial arrangement was the advertisements, and it's just like the Mavericks case in the Ninth Circuit. Again, and so what the Ninth Circuit said in Mavericks was that this advertising was relevant to intent. Now, what the other side says is, look, it's not us. These are third-party ad brokers or third-party advertisers that are making the privacy policy makes clear, and this is at JA 176, that the defendants will take your IP address, country of origin, and that that, quote, may be used to provide targeted advertising based on your country of origin and other personal information, so they are doing just what they say. Then, in the Mavericks case, again, the court there, the Ninth Circuit, rejected defendants' very effort to disassociate themselves from their advertising. What the court said there was, the advertising helps to show that the defendants, quote, continuously and deliberately targeted the market, and so what the court said was, it is immaterial whether the third-party advertisers or the defendant targeted California residents. The fact that the advertisements targeted California residents indicates that defendant knows, either actually or constructively, about its California user base and that it exploits that base for commercial gain by selling space on its websites for advertising. And so, I guess at the end here, and I'll wrap up and save the remainder of my time for rebuttal, this is a classic case under Zippo's first framework, the first category of Zippo, of knowing a repeated transmission. It is the easy case, but even if the court disagrees and thinks we're in the middle category, it's ever interactive. All of the facts and it is not the law that if you operate everywhere, you can be sued everywhere. It is not the law that you can set up your system to facilitate massive infringement by U.S. users and then throw up your hands and say, gosh, I had no idea this was going to happen. And it is not the case. Speaking of throwing up hands, I have a question. Sure. So, you don't need discovery anymore? So, Your Honor, we think that we have, for all the reasons we've said, presented this court and the district court with more than sufficient evidence to find there's jurisdiction. If for some reason this court were to conclude otherwise, then we think we would be entitled to jurisdictional discovery to get more information about the intent of the parties, of the defendants, why they don't filter, what their advertising arrangements are. But no, Your Honor, we think that there is sufficient evidence right now for this court, based on the third biggest market, based on the conceded lack of filtering, based on the conceded commercial arrangements, the conceded knowing and repeated transmission of files, and the conceded registration of a DMC agent, that we don't think discovery is necessary for the court to rule for us. We do think discovery would be necessary before the court could rule against us. And with that, I'll reserve the remainder of my time for rebuttal. Thank you, Your Honor. Roy Wood, sir. Good morning, Your Honors, and I'm afraid that I am going to have to start with a technological issue. I did not want to interrupt Mr. Gershengorn, but about two minutes before he concluded his argument, everyone disappeared. Mr. Gershengorn, the court, I have nothing left but myself, which is less than ideal. And I don't know about the other panel members, but I can't see you either. Yes, same here. All right, thank you. Mr. Frey-Witzer. Thank you, Your Honor. Good morning, and may it please the court, my name is Evan Frey-Witzer, and I represent the appellee in this matter, Tofig Kurbanov. Mr. Kurbanov is a Russian citizen who for his entire life has lived and worked in the same small city in southern Russia. He has never once visited the United States, never done business in the United States, never owned property here, never paid taxes here, and never held a bank account here. From his home in Russia, Mr. Kurbanov created two websites which he has operated entirely and exclusively from Russia. These websites, Your Honor, are the modern-day equivalent of an old-fashioned tape recorder. They allow a visitor to the websites to enter a URL into a search box, and if there is a video at the user-selected URL, the website records the audio track, allows the user to save the audio track to their own computer so that the user can listen to it offline, and as soon as the user downloads it... Excuse me, I have a question. Yes, Your Honor. But how does the user know to go to the website and do all that? The websites have proven to be very popular, Your Honor. They do not advertise at all. They have never advertised their own services. I believe that the majority of the site traffic comes, for example, from Google, so that someone is looking for... Doesn't your client have a third party or something place ads, do targeted ads, to drive traffic to the website? No, Your Honor, and if I might explain, I can understand why it would be confusing. The advertisements that you are talking about, the advertisements that are placed through advertising brokers are not for the websites. If you imagine going to any website nowadays, you might see a box at the top with an advertisement. Very often, Google ads places those ads, and so someone who owns a website might contract with Google and say, you can have the top two inches of my website. You can run whatever ads you want there. I don't care what you run there so long as they're not illegal. So your client contracted with somebody to put ads at the top of the website? Yes, Your Honor, though I do want to be clear, those ads are not for our websites. I understand, but your client did reach out to, apparently, some sort of third party or advertisers in the United States to put ads at the top of the website? No, Your Honor, as the District Court found, and as we said in Mr. Kurbanov's affidavit filed in the District Court, the only ad brokers that Mr. Kurbanov had dealt with were in Russia and Ukraine. Those ad brokers go out to the world and sell space on various websites, including the two websites that Mr. Kurbanov was running. But the relationship, even with the ad brokers, did not touch on the United States. So your client told the ad brokers, don't go to the United States, everybody but the United States. I don't want to advertise there, or I don't want my website there. Because I could be held into court there, don't go there. No, as with almost every website operator that provides space on their site, they simply said to the ad brokers, we don't want anything illegal on our site. And I would point, Your Honor, because I understand the question and I understand the argument that Mr. Gershengorn has made, which is, well, you could engage in what's called geo-blocking. I would ask the court, and we've cited these two cases, the District Court case and a Serpuk court case, both from the District of Columbia. It's the triple-up case, as we refer to it. I think that Mr. Gershengorn called it the Yuko case. But that was one of the few cases that directly addresses precisely what Your Honor is talking about, this type of advertising and the ability to geo-block that is available. And although Mr. Gershengorn says to the court that Yuko is distinguishable from this case because the websites in Yuko were not in English, what Mr. Gershengorn has missed is that the advertisements were in English. The advertisements were in English because they were specifically being aimed at a United States market by the advertising brokers that the website had engaged. And the Yuko court said that if you were to require a website to geo-block, to avoid personal jurisdiction, then you would have turned the entire notion of personal jurisdiction on its head. Because, of course, what personal jurisdiction requires is that the defendant's actions bring him within the jurisdiction. And what the Yuko court said was this is requiring exactly the opposite. It is requiring all of a sudden for a website to avoid going into the jurisdiction and that there's never been a requirement of that. The case, and I'm sorry, I'm just looking for the quote. But what the case basically says is that geo-blocking has never been a requirement of personal jurisdiction. And it is dangerous indeed, as the Yuko court said, to suggest that that would be. Judge Lloyd has a question. Oh, I'm sorry, Judge Lloyd. That's all right. Can you explain to me what geo-targeting is as opposed to geo-blocking? Yes, Your Honor. So geo-targeting is, and most of us have seen this at one point or another, whether or not we've recognized it. You might go to a website and an ad appears at the top of the website that is advertising some sort of local product or service. That is what is known as geo-targeting. And what happens in this instance and what happens with the websites at issue in this case is Mr. Kurbanoff had a contractual relationship with an advertising broker, as I said, also in Russia. He provides to that broker the code that runs the website. And he also can provide to the broker information about where users are coming from. With that information, the advertising broker, when they go out and sell the ads, someone might say to an advertising broker, well, I'd like you to focus my ads on Italy or Brazil or Mexico. And so the ad broker can write into the code that he's putting onto the website that the ads will be shown in those locations as opposed to other locations. Well, is the United States one of those targeted areas? Honestly, and as we've said in our brief and in Mr. Kurbanoff's declaration again, he doesn't know. He really is not. It's not his focus. Is it possible that some of the advertising brokers have geo-targeted? Absolutely. Is it possible that they've done it to the U.S.? Yes. Yes, Your Honor. So can willful blindness work to absolve your client of jurisdiction just anywhere that he is willfully blind, apparently, that his ads are being targeted? Again, Your Honor, they're not his ads. All of it is based on his website that someone else, you've got sort of three parties removed. You have the advertising. Does your client know that the websites are being utilized in the United States? It's his third, I guess, his third biggest market. Does he know that? Fourth, though I won't quibble. Okay, does he know that? I'm certain he does, Your Honor. Google Analytics provides data. People can look at the data. They understand that their websites are popular all around the world, quite honestly. The websites are available in 23 different languages and are viewed in over 200 different countries. Less than 10% of all of the traffic going to these sites comes from the United States. The issue, I think, Your Honor, and actually, let me start first by saying. Is my mic on? Hello, is my mic on? Yes. It is now. I can. It wasn't on? Okay. A big part of the district court's ruling was that the relationship between the website and the visitors is noncommercial. Is that right? Yes, Your Honor, and the reason that the district court found that is that the websites are entirely free to users. There's no charge. There's no membership. They don't even take an e-mail address for the users. There's no sign-up. There's no log-in. There's no information whatsoever that the websites collect. Let's unpack that. Don't they have to click on something to enter into an agreement that you said constitutes a contractual agreement? There is a single click box to accept terms of service, and I'm sorry, Your Honor. And those terms say that's a contractual relationship, doesn't it? So you can sue them civilly and criminal action wherever they're found. Is that right? Yes, Your Honor, and, in fact, the interesting thing about the wherever they can be found. Your client has a contractual relationship with over 400,000 virginians. Well, I don't know that I would agree with that, Your Honor. But even if I did, the sheer number is not by itself sufficient, and there are a number of reasons for that. One is the primary reason that when you are looking at just those sheer numbers, you are including in those numbers a tremendous number of non-suit-related interactions. And by that, what I mean is you have an aggregate number of people who come to the website. Like any other website, you have people who will have come there, were curious about the website, looked at it, and never entered a URL into the search bar. Then you have a number of people who have entered URLs into the search bar but have done so not for music. There are articles, and we've submitted some of them, and they were submitted to the district court, in which people say that they use these kinds of services all the time, for example, to download freely available lectures so that they can take them with them. Well, those have nothing to do with the plaintiff's claims here, and so you can't count those either. Then to the extent that music is involved, YouTube says that only 2.5% of all of the traffic on YouTube is related to music. Well, even that, Your Honor, is not necessarily suit-related because not all music is owned by the plaintiffs. There is music that is freely available and has nothing to do with the plaintiff's claims. What you come down to at the very end is that if you look at the complaint and look at the materials that plaintiffs submitted in the district court, they have never once said how many people in Virginia or the United States have actually used either of these websites to infringe on their files. And as they said to the district court, and they've said now to Judge Thacker as well, they don't even need discovery for it. They asked for jurisdictional discovery in the district court in a single footnote in their brief, in which they start the footnote by saying, we don't actually need any discovery. Then they say, if the court were to disagree with us, well, we guess we would take it, though they don't explain what they would ask for. And they conclude the footnote by also saying, and in conclusion, we don't actually need jurisdictional discovery. If they had wanted to take the jurisdictional discovery so that they could determine whether or not there actually were suit-related contacts, they could have done so, but they voluntarily decided not to do so. The other reason, and there are a few reasons, and I think that you're right, the sheer numbers argument is the most important thing to address here. But if we were to accept the arguments that plaintiffs are making, that would mean that any popular website is automatically subject to universal jurisdiction. As I've said, the websites at issue here are viewed in over 200 separate countries, and that would mean that without having actually reached out or taken any positive steps himself to enter into those countries, that he would be subject to personal jurisdiction in every single one of those countries. If the large numbers are themselves enough, it is precisely what this court warned against in the ALS scan case, where the court said if we were to conclude as a general principle that a person's act of placing information on the internet subjects that person to personal jurisdiction in each state where the information is accessed, then the defense of personal jurisdiction, in the sense that it is geographically limited, would no longer exist. The person placing information on the internet would be subject to personal jurisdiction in every state. If that broad interpretation of minimum contacts were adopted, state jurisdiction over persons would be universal, and notions of limited state sovereignty in personal jurisdictions would be eviscerated. Yes, Your Honor. A question. So what is your best argument that it is not foreseeable to your client that he would be hauled into court in the United States based on his websites? I think, Your Honor, that the best arguments are that the consistent jurisdiction from this court and from the United States Supreme Court always says that what is important is the descendant's own actions. In this case, you have users who are choosing to access the website or not choosing to access the website from whatever location they choose. There are two cases that were recently decided from district courts within the Fourth Circuit. One is the Prisma case, and the other is the WhatsApp case. And in both of those cases, the court said, look, there are hundreds of millions of users, hundreds of millions of users, and yet those users are all deciding where they are accessing the, in that case, they were phone apps, where they're accessing those apps from. It is not something that the defendant himself had control of. And the other is that the cases seem to consistently say that what is really important is not the mere numbers, but the fact that a defendant has targeted a particular form. And that's really, I think, probably the best case argument here. Mr. Kervanov had done nothing to target the United States. The websites are content neutral. It is not a case where he found something that people in the United States were particularly What about, doesn't he have an agent with the U.S. Copyright Office? Didn't he register an agent? He has a gentleman in Russia who has been named as an agent to accept complaints under the DMCA. Now, if you look at the terms of service, and again, they're in the record. If you look at the terms of service, they specifically say, although we are not bound by DMCA, we endeavor to voluntarily remove copyright-violating materials from our websites. And so they have a DMCA agent. And there are, I think, three reasons why that cannot possibly be counted jurisdictionally. One is that this court and every court can look at the question of whether or not the appointment of an agent for service of process is sufficient to state a jurisdictional claim. And every court has said no. The second reason is that communications between an individual and a government office are not permissible for the jurisdictional inquiry. And the third reason, quite honestly, is if this court were to find that the registration of a DMCA agent meant that someone was subject to personal jurisdiction, no one would register DMCA agents. It would actually be detrimental to the producers. And I see I'm out of time, Your Honor. Thank you. Thank you, counsel. Mr. Gershengorn? Thank you, Your Honor. I just have a few brief points. Let me start with the advertising. A lot of talk in the other side's argument was spent on this Triple Up case and advertising and the role of filtering. Let me just quote, since it seems to be a question of what happened in Triple Up, that this is a quote from the D.C. Circuit opinion. Triple Up has not alleged facts plausibly showing that Youku played a material role in pairing advertisements with specific videos based on viewerships. Triple Up's own evidence proves the insufficiency of the connection in that the advertisements accompanying two of the three films were in Mandarin for Chinese video games. So the suggestion that somehow we have miscited Youku isn't right. What has happened here, to go to Judge Floyd's question, is exactly that advertisers are sending different ads to Virginia than they would send to California. Different ads to the United States than they would send to Brazil. And the reason they do that, Your Honor, is because they want to maximize the value of their American viewership. That's what the Mavericks court in the Ninth Circuit said, and that's what's relevant here. Let me turn now to filtering. So it's extremely important that they could block and don't. And Judge Thacker, you asked that question. It seems exactly right. The First Circuit addressed that and said worldwide video illustrates a significant difference between this case and the prototypical stream of commerce one. There, of course, the plaintiff drove his car into Oklahoma, a market the defendant didn't serve. A car manufacturer cannot limit where its customers take its product. In contrast, the defendant here can take steps to limit access to its website. It could design the site not to interact with U.S. users. It could take the low-tech step of posting a disclaimer. Their website gives no indication it's not meant for U.S. consumption. Third, the idea that people are going to this website because they want to, quote, download free lectures is preposterous, and nobody seriously thinks it. The court could look at our reply brief. The United States Trade Representative cited FLVTO, this is on page 7 of our reply brief, and Toucan V, excuse me, as, quote, examples of the stream-ripping phenomenon that continues to threaten legitimate streaming and audio and video services, music performers, and composers, close quote. The idea that this is being used to download free lectures can't be taken seriously. Fourth, there was an analogy that wasn't really pursued, I think, for good reason, that this is just like the old-fashioned tape recorder. If you had an old-fashioned tape recorder and you recorded hundreds of millions of songs and then you sent those out to users across the world, including more than 100 million in the United States, yes, you would be subject to jurisdiction in the United States for that misuse and abuse of your tape recorder. That's all a record is, Your Honor. It's a recording of a song that you put on vinyl. If you mail 100 million records to the United States, you are subject to personal jurisdiction in the United States. Judge Gregory, I was glad you pointed to the commercial arrangement. There really wasn't an answer, as opposing counsel was ticking off all the things that aren't done. I did notice, as did you, that the one thing he didn't say was there was a contractual arrangement, and, of course, that's what this is. It is a contract, and, indeed, in the terms of use, they reserve the right to, quote, change the fees. So this is a classic commercial arrangement on the Internet, and I noticed the other side did not try to pursue the argument that somehow Google and Facebook are not commercial entities. At the end of the day, then, what this comes down to is two things. First, the other side's effort to create a straw man. They keep saying our argument is about sheer numbers and that anywhere a website is accessible, there's jurisdiction. I want to be crystal clear. That is not our argument. It is not the case that we are saying there's jurisdiction here because there are large numbers, merely, or because it's merely accessible. The knowing and repeated transmission of files is not mere accessibility. That is the kind of regular course of business, the knowing course of business, that creates jurisdiction in any situation. This, Your Honor, is, I think, if this court were to go down the road the other side said, where you can create a situation where there's knowing and repeated files transmitted, where it's your third biggest market, where the only way to disassociate yourself from your users is to say, look, I set up this product. I can't be responsible for how they use it. Then this court has created the recipe for infringement that every pirate website will adopt and it will eviscerate the U.S. copyright laws. That is not the purpose of personal jurisdiction, and it's a perversion of due process to call it that. Thank you, Your Honors. Thank you, Counsel. We'll have to suspend, unfortunately, our tradition of coming down to Greene County. But know, in the virtual world, we do it heartily, and we thank you very much for doing the technology and went well, and you performed very well. We appreciate that. And to both of you, be safe and stay well. Thank you, Counsel. Thank you. Thank you, Your Honor.
judges: Roger L. Gregory, Henry F. Floyd, Stephanie D. Thacker